IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| KEVIN DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:23-cv-00208 |
| | ) | |
| vs. | ) | United States Magistrate Judge |
| | ) | Christopher B. Brown |
| JOHN WETZEL, ROBERT | ) | |
| HAMMOND, E. ARMEL, | ) | |
| SUPERINTENDENT; S. ERICKSON, | ) | |
| UNIT MANAGER; AND JOHN DOES | ) | |
| 1 AND 2, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION
ON MOTION FOR SUMMARY JUDGMENT, ECF NO. 51[1]

**Christopher B. Brown, United States Magistrate Judge**

Plaintiff, Kevin Davis**,** is a state prisoner incarcerated within the

Pennsylvania Department of Corrections ("DOC") at the State Correctional

Institute at Fayette ("SCI-Fayette"). In February 2023, he initiated this action

under 42 U.S.C. § 1983 alleging he has improperly been denied a transfer to his

home region in violation of his rights under the First, Eighth, and Fourteenth

Amendments. *See* ECF No. 6.

---

[1]    In accordance with the provisions of 29 U.S.C. § 636(c)(1), all served parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including trial and the entry of a final judgment. *See* ECF Nos. 2 and 16. The only parties who have not been served are two unidentified John Doe defendants. While unserved defendants generally must also consent for a magistrate judge to exercise jurisdiction based on "consent of the parties" under that statute, *see Williams v. King*, 875 F.3d 500 (9th Cir. 2017), this Court is unaware of any decision holding that consent is necessary from defendants who are both unserved and unidentified.

Pending is Defendants Wetzel, Hammond, Armel, and Erickson's motion for summary judgment. ECF No. 51. The motion has been fully briefed and the factual record thoroughly developed. *See* ECF Nos. 52-1, 53, 66, 67, 67-1, and 70.

After carefully considering the motion, the material in support and in opposition, the parties' memoranda, the relevant case law, and the summary judgment record as a whole, the motion will be granted in its entirety and summary judgment will be entered for Defendants Wetzel, Hammond, Armel, and Erickson.

## I.    Background

### A.    Factual Background[2]

In September 1977, Davis was found guilty of first degree murder and subsequently sentenced to mandatory life without the possibility of parole. ECF No. 28 at 3.[3] At the time of the offense, Davis was seventeen years old. *Id.* On May 15, 1978, he was committed to the custody of the DOC. ECF No. 53, ¶ 13.

In 2012, the Supreme Court of the United States held that a mandatory life sentence without parole for juvenile offenders was unconstitutional. *See Miller v. Alabama,* 567 U.S. 460 (2012). Four years later, the Supreme Court ruled *Miller*

---

[2]     The factual summary is derived from the DOC Defendants' statement of material facts, Davis's responsive statement of disputed factual issues, and the exhibits submitted by the parties in support of their respective positions. To the extent Davis replied to the DOC Defendants' statement of material facts by merely stating "disagreed," but did not provide anything more such as a specific basis for the disagreement or a controverted statement, the Court has deemed those statements admitted. Local Civil Rule 56(E) provides "[a]lleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party."

[3]     For ease of reference, the Court uses the page numbers from the CM/ECF headers.

should be applied retroactively.  *See Montgomery v. Louisiana*, 577 U.S. 190 (2016). As a result of those judicial decisions, on April 16, 2018, Davis was resentenced to a term of imprisonment of 40 years to life.  ECF No. 53, ¶ 14.  About five years later, in December 2023, Davis was paroled to a detainer sentence and immediately commenced serving a consecutive life sentence for another homicide charge.  ECF No. 53, ¶ 15; ECF No. 66, ¶ 15.

After the Supreme Court's decision in *Miller*, the DOC provided its institutions with direction to assist and prepare the prisoners impacted by the *Miller* decision, referred to as "juvenile lifers,"[4] for release and reintegration.  ECF No. 53, ¶ 16.  The reintegration measures included assisting juvenile lifers with matters such as processing their photo identifications, encouraging them to apply for their birth certificates, and requesting their social security cards.  Additionally, institutional staff were advised to prioritize juvenile lifers' placement in certain programs, including vocational training.  *Id.*, ¶ 17.  Defendant Hammond held video conferences with the juvenile lifer inmate population to address matters relative to their status.  *Id.*, ¶ 18.

The crux of this lawsuit is Davis's contention the DOC has a policy, practice, or procedure to transfer juvenile lifers to an institution within their home region upon resentencing.  *Id.*, ¶ 20.  And yet, despite Davis being resentenced in April 2018, and despite the DOC policy, practice, or procedure, Davis has not been transferred to his home region.

---

[4]      A "[j]uvenile [l]ifer is defined as a life-sentenced inmate who was under the age of 18 at the time the crime was committed."  ECF No. 67-9 at 1.

### B.    Procedural History

Davis initiated this case in February 2023 by filing a civil rights complaint without paying the filing fee or filing a motion for leave to proceed in forma pauperis ("IFP Motion").  ECF No. 1.  In March 2023, he tendered the full filing fee, ECF No. 5, and the complaint was docketed.  ECF No. 6.  Defendants are officials and employees of the DOC: John Wetzel, former Secretary of the DOC; Robert Hammond, Treatment Program Manager for the DOC; E. Armel, former Superintendent of SCI-Fayette; S. Erickson, Unit Manager at SCI-Fayette (collectively, the "DOC Defendants"); and two DOC John Doe Defendants.  All defendants are named only in their individual capacities.  *Id.*

Davis filed an Amended Complaint in June 2023, which remains his operative pleading.  ECF No. 20.  According to Davis, DOC has a policy that juvenile lifers after resentencing are to be returned to their home regions.  Yet, despite this policy, the DOC refuses to transfer Davis.  His claims fall into three categories: (1) the refusal to transfer him to his home region violates his First Amendment rights because the refusal is in retaliation for Davis engaging in protected activity; (2) the exposure to coal ash and contaminated water at SCI-Fayette violates the Eighth Amendment's prohibition of cruel and unusual punishment; and (3) the refusal to transfer him violates his Fourteenth Amendment right to equal protection as he is being treated differently from similar situated juvenile lifers when there is no rational basis for the difference in treatment.  *Id.*[5]

---

[5]    These claims are the subject of Grievance No. 997172.

Discovery has closed and the DOC Defendants now move for summary judgment.  ECF No. 51.

## II.    Jurisdiction and Venue

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b) as the events giving rise to this lawsuit occurred in Fayette County, which is within the territorial boundaries of the United States District Court for the Western District of Pennsylvania, 28 U.S.C. § 118(c), and all Defendants are residents of the Commonwealth of Pennsylvania.

## III.    Legal Standards

### A.    Summary Judgment Standard

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law[.]"  *Id.* at 248.  A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact.  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).  When the movant is the defendant, it has the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of [his] case."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  If

the movant sustains its initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (cleaned up) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

At the summary judgment stage, the Court's role is not to "weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. But "conjecture and speculation" cannot create a genuine issue of material fact. *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016). And the Court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### B. Pro Se Pleadings and Filings

Davis is proceeding pro se, thus he is entitled to a liberal reading of his pleadings and documents filed in opposition to the pending motion. *Higgs v. Atty. Gen. of the U.S.*, 655 F.3d 333, 339 (3d Cir. 2011), *as amended* (Sept. 19, 2011) ("The obligation to liberally construe a pro se litigant's pleadings is well-established."). If the Court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal

authority, confusion of legal theories, poor syntax, and sentence construction, or the litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall*, 454 U.S. 364 (1982).

That said, at the summary judgment stage of the proceedings, the Court need not credit bald assertions or legal conclusions unaccompanied by evidentiary support. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[A] *pro se* plaintiff is not relieved of his obligation under [Federal Rule of Civil Procedure] 56 to point to competent evidence in the record that is capable of refuting a defendant's motion [for summary judgment]." *Alston v. Little*, Civ. Act. No. 1:22-cv-00183, 2024 WL 3048017, at *2 (W.D. Pa. May 28, 2024), *report and recommendation adopted*, 2024 WL 3046475 (W.D. Pa. June 18, 2024) (quoting *Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017)) (citation omitted).

Because Davis is a pro se litigant, the Court will consider the facts and make inferences where appropriate.

### C.    Civil Rights Statute, 42 U.S.C. § 1983

Davis brings his claims under 42 U.S.C. § 1983,[6] which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, . . . .

---

[6]    Title 42, United States Code, § 1983, "is not a source of substantive rights but a vehicle for vindicating rights conferred by the U.S. Constitution or by federal statute." *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) (citation omitted).

To prevail on a claim under Section 1983, a plaintiff must establish that a defendant, acting under color of state law, deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  42 U.S.C. § 1983; *see also Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citations omitted). Davis alleges the DOC Defendants have violated his First, Eighth, and Fourteenth Amendment rights by refusing to transfer him.  The DOC Defendants do not dispute that at all relevant times they were acting under color of state law.  Thus, the Court's analysis focuses on whether the DOC Defendants deprived Davis of rights secured by the First, Eighth, and Fourteenth Amendments to U.S. Constitution.

## IV.    Discussion

The DOC Defendants move for summary judgment contending Davis failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), and, alternatively, there is no genuine dispute of material fact as to the merits of his claims.  *See* ECF No. 52 at 1-2.  Davis responds the administrative remedies were rendered unavailable and summary judgment is not appropriate as genuine disputes of material fact exist.  ECF No. 67. The Court will take the DOC Defendants' arguments in turn.

### A.    Davis Failed to Properly Exhaust his Administrative Remedies

The PLRA requires prisoners to present their claims through an

administrative grievance process before seeking redress in federal court. It provides

that "[n]o action shall be brought with respect to prison conditions under section

1983 of this title, or any other Federal law, by a prisoner confined in any jail,

prison, or other correctional facility until such administrative remedies as are

available are exhausted." As recently explained by the Court of Appeals for the

Third Circuit:

> The exhaustion mandate is a "centerpiece" of the statute, *see Woodford v. Ngo*, 548 U.S. 81, 84 (2006), that serves three important statutory goals: "(1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits, *Spruill [v. Gillis]*, 372 F.3d [218,] 230 [3d Cir. 2004]. The PLRA requires "proper exhaustion," *Woodford*, 548 U.S. at 92, which means "complet[ing] the administrative review process in accordance with the applicable procedural rules." *Downey v. Pennsylvania Dep't of Corrections*, 968 F.3d 299, 305 (3d Cir. 2020) (quoting *Woodford*, 548 U.S. at 88). The only limit on § 1997e(a)'s mandate is that "administrative remedies must be available to the prisoner" as both a formal and practical manner. *Id.* (citing *Ross v. Blake*, 578 U.S. 632, 641-42 (2016)).

*Talley v. Clark*, 111 F.4th 255, 262 (3d Cir. 2024). An administrative remedy is

unavailable, and administrative exhaustion is excused, when it "operates as a

simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable

of use, or when prison administrators thwart inmates from taking advantage of a

grievance process through machination, misrepresentation, or intimidation.'"

*Downey v. Pennsylvania Dep't of Corrections*, 968 F.3d 299, 305 (3d Cir. 2020)

(quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019)) (cleaned up). "Just

as inmates must properly exhaust administrative remedies per the prison's

grievance procedures, prison officials must strictly comply with their own policies." *Id.* In these situations, "[w]hat is good for the goose is good for the gander," and "as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." *Shifflett*, 934 F.3d at 335, 367. Proper exhaustion requires full compliance with the prison's deadlines and procedures, and an untimely or procedurally defective grievance or appeal does not satisfy the PLRA and precludes a prisoner from subsequently filing his claims in federal court. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004); *Booth v. Churner*, 206 F.3d 289 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001). *See also Woodford v. Ngo*, 548 U.S. 81 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."). Failure to substantially comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. *Spruill,* 372 F.3d at 227-32.

It is not the plaintiff's burden to demonstrate exhaustion. *Jones*, 549 U.S. at 216 (holding that "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Exhaustion is an affirmative defense that the defendant "must plead and prove." *Paladino v. Newsome*, 885 F.3d 203, 207 (3d Cir. 2018) (citation

omitted).  If a defendant shows that administrative remedies were not exhausted, the plaintiff bears the burden of demonstrating that such remedies were, in effect, unavailable.  *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018).  The district court may resolve exhaustion-related factual disputes so long as the parties were given notice and sufficient opportunity to be heard, *Paladino*, 885 F.3d at 210–11 (quotation omitted), and the exhaustion issue is "not intertwined with the merits of a claim that falls under the Seventh Amendment."  *Perttu v. Richards*, 600 U.S. 460, 468 (2025); *Paladino*, 885 F.3d at 210-11 (quotation omitted).[7]

In Pennsylvania, the general grievance process applicable in facilities operated by the DOC is found in policy DC-ADM 804.  *See* ECF 52-1 at 28-62; ECF 67-19 at 4-25.  That policy sets forth a three-step grievance process.  *Id.* These three steps are also described in the DOC Inmate Handbook, 2017 Edition.  ECF No. 67-23 at 34-35.

First, after an attempt to resolve any problems informally, a prisoner may submit a written grievance to the facility's Grievance Coordinator for initial review.  ECF No. 52-1 at 31-41.  If dissatisfied with the results of the initial review, a prisoner must then appeal to the Facility Manager.  *Id.* at 42.  If the prisoner receives an adverse response from the Facility Manager, the prisoner then must appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), the

---

[7]    The Supreme Court's recent decision limiting the circumstances in which courts may act as the factfinder is inapplicable here as the exhaustion issue is not intertwined with the merits of any claim Davis raises.  *Perttu v. Richards*, 605 U.S. 460, 468 (2025) (holding "that parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment").

final level of review. *Id.* at 45. DC-ADM 804 states, "SOIGA will ensure that an appeal to final review is responded to within 30 working days of receipt" of the grievance. *Id.* at 48; *Spruill*, 372 F.3d at 232.

The DOC Defendants argue Davis did not properly exhaust all administrative remedies available to him as his final appeal was dismissed because it exceeded the two-page limitation stated in DC-ADM 804, Section 2.B.1(e)(4). ECF No. 52 at 3-5; ECF No. 52-1 at 33, 42, 46.

The undisputed summary judgment evidence of record shows that Davis submitted Grievance No. 997172 on September 11, 2022, asserting: (1) DOC was refusing "to abide by policy to return" Davis to his home regions after he was resentenced in retaliation for engaging in protected activity; (2) exposure to the toxic coal ash at SCI-Fayette was placing Davis at high risk of health problems because he is a diabetic; and (3) Davis was being treated differently than similar situated juvenile lifers when there was no rational basis for the difference in treatment. ECF No. 52-1, at 21-22. It is also undisputed the grievance was denied on the merits at both the initial review by the grievance officer, *id.* at 19, and on appeal by the facility manager. ECF Nos. 52-1 at 9, 19; 67-18 at 2; and 67-19 at 2. And there is no dispute that Davis's final appeal was rejected by SOIGA for failing to comply with the procedural requirement for filing an administrative appeal, because "[t]he grievance or appeal exceeded the two page limit as stated in the DC ADM 804." ECF Nos. 52-1 at 8; 67-25 at 2.

DC-ADM 804 specifically states that each final appeal must "not exceed two pages (two one-sided or one double-sided 8 1/2" x 11" page)."  ECF No. 52-1 at 46. Davis submitted his final appeal to SOIGA in a three-page typewritten letter dated November 2, 2022.  ECF No. 67-20.[8]   On December 14, 2022, SOIGA dismissed the final appeal because it exceeded the two-page limit as stated in DC-ADM 804.  ECF No. 52-1 at 8.

Davis contends his final appeal was in "substantial compliance" with DC-ADM 804 and the summary judgment record demonstrates a "sufficient disagreement regarding whether state remedies were unavailable."  ECF No. 67 at 8-13.  He also argues his procedural default should be excused on four grounds: (1) SOIGA did not timely respond rendering an administrative remedy unavailable; (2) he was misled or thwarted by the instructions that were issued by prison officials; (3) he filed previous final appeals that exceeded the page limits and those appeals were not dismissed; and (4) DOC violated its own policy by having officials investigate his grievance who were the subject of  his claims.  The Court finds each of these arguments to lack merit.

First, by Davis's calculations, SOIGA "had thirty (30) days to respond, i.e., till December 13, 2022.  The Defendant's responded on December 14, 2022. . . .  after the time to respond had expired, their grievance procedure was unavailable."  *Id.* at 9.  DC-ADM 804 provides "SOIGA will ensure that . . . an appeal to final review is responded to within 30 working days of receipt unless otherwise extended **and/or**

---

[8]        Davis contends his submission was 2-1/2 pages, not 3. ECF No. 66 at ¶ 60.

**referred**[.]" ECF No. 52-1 at 45 (emphasis in original). "Working Days" is defined as "Monday through Friday, *excluding state holidays*." *Id*. at 62 (emphasis added). The summary judgment record does not reflect when SOIGA received Davis's final appeal.[9] Yet the earliest date SOIGA could have received Davis's final appeal is November 2, 2022, i.e. the date Davis submitted his final appeal to SOIGA. The time elapsed between November 2, 2022 and December 14, 2022, excluding weekends and state holidays, was 28 days.[10] So while Davis is correct in that SOIGA had 30 working days to respond, he appears to have failed to exclude from his calculations the two state holidays that fell within that thirty-day period.

Next, in support of his argument that he was misled, Davis contends the 2017 Inmate Handbook did not inform him of the page limits.[11] Davis acknowledges the 2017 Edition directs the user to DC-ADM 804, but he argues:

> The Table of Contents directed Plaintiff to page nine for DC-ADM 804. (See Appx. 21.a). Page nine explains how to file the initial grievance. Id. Page ten explains how to file an appeal. Id. It says nothing about a page limit and the reader is not directed anywhere else.

---

[9]    Attached to the Declaration of Rhonda House is Davis's grievance history. ECF 52-1, at 7. While the grievance history appears to reflect the date Grievance No. 997172 was received by the facility grievance counselor, 9/12/2022, the DOC Defendants have provided no evidence reflecting when SOIGA received the final appeal. *See* DC-ADM 804.B(2)(a)(2) ("an appeal and response are properly maintained in the Automated Inmate Grievance Tracking System[,]").

[10]    Excludable time includes 6 Saturdays, 6 Sundays, Veterans Day (November 11, 2022), and Thanksgiving Day (November 24, 2022).

[11]    It is not disputed the 2017 Edition of the Inmate Handbook was in effect at all times relevant to this action.

ECF No. 67 at 12.  *See* also ECF No. 67-32 at 34-35.[12]  Davis argues that in other

sections of the Inmate Handbook where additional information is required, the 2017

Edition states, for example, "for more information about abuse allegations, refer to

DC-ADM 001" and "Detailed information about mail privileges appears in DC-ADM

803." ECF No. 66, ¶ 42.  According to Davis, due to the absence of any type of

reference to a page limitation, he was "misled or thwarted by the instructions that

were issued by prison officials."  ECF No. 67 at 10.

The Court finds this argument to be without merit for several reasons.  First,

a prisoner cannot avoid full compliance with grievance procedures by merely

alleging the DOC policies were not clearly explained to him.  *See Davis v. Warman*,

49 F. App'x 365, 368 (3d Cir. 2002).  Next, Section II – Daily Operations, paragraph

I of the 2017 Handbook is entitled **"Inmate Grievance System (DC-ADM 804)."**

ECF No. 67-23 at 34 (emphasis in original).  The title alone put Davis on notice that

the policies and procedures to file a grievance were governed by DC-ADM 804.  *See*

*also* ECF No. 52-1 at 26 ("Through the Department's Inmate Handbook, inmates

are provided with notice of the Grievance Policy and the requirements they must

meet in grieving their issues through the Grievance Policy.")  Additionally, the

Inmate Handbook does state "the statement of facts must not exceed two pages and

must be handwritten or typed on writing paper." ECF No. 67-23 at 34.  And finally,

---

[12]        Unlike the 2017 Edition, Davis points out that the 2015 Edition (which the Court notes is not a part of the summary judgment record) and the 2023 Edition provide instructions on page limits. *See* ECF No. 67-34 at 10 (the 2023 Edition) ("a brief appeal to SOIGA (not to exceed one two-sided or two one-sided sheets of 8 1/2" x 11" sheets of paper)[.]").  Davis argues "that a reasonable jury could find that the new 2023 Edition disputes that the 2017 Edition had a page limit for appeals and Plaintiff was in substantial compliance with the Inmate Handbook 2017 Edition because it lacked a page limit and did not direct inmates anywhere regarding a page limit."  ECF No. 67 at 13.

even if that was not enough, the actual DOC grievance forms all included references to DC-ADM 804.  For example, the bottom of the initial grievance form Davis used to submit Grievance No. 997172 references "DC-ADM 804, Inmate Grievance System Procedures Manual.  Section 1 – Grievances & Initial Review."  ECF No. 52-1 at 21. And more importantly, the Facility Manager's Appeal Response references DC-ADM 804, Inmate Grievance System Procedures Manual, Section 2 – Appeals." ECF No. 52-1 at 9.  The forms also explicitly reference the two-page limit. ECF No. 52-1 at 21, 53, 54.

Davis's third argument reflects an equitable argument.  He contends because his previously filed final appeals were in excess of the page limit requirement and those appeals were not dismissed, he should be excused from having to comply with the page limits.  This argument also lacks merit.  Courts have recognized a clear "reluctance to invoke equitable reasons to excuse [a prisoner's] failure to exhaust as the statute requires." *Davis v. Warman*, 49 F. App'x at 368. *See Rivera v. Pennsylvania Dept. of Corr.*, 388 F. App'x 107, 108-09 (3d Cir. 2010) ("'proper exhaustion' requires a prisoner to comply with an agency's deadlines and other critical procedural rules"), *cert. denied*, 562 U.S. 1145 (2011) (*citing Woodford*, 548 U.S. at 90-91).

And Davis's fourth argument is equally unavailing.  He argues the DOC violated its own policy by assigning his grievance "to officials who were the subject of the grievance in violation of DC-ADM 804[.]" ECF No. 66 at 9.  DC-ADM 804, Section 1(C)(3) states, "the Facility Grievance Coordinator/designee will designate a

staff member to serve as the Grievance Officer for that grievance. The staff member who serves as the Grievance Officer shall not be directly involved *in* or named as the subject of the grievance . . . ." ECF No. 52-1 at 36 (emphasis in original). Similarly, DC-ADM 804, Section 2(A)(2)(a) states, "[t]he Grievance Officer, **and/or a staff member involved in or named as the subject of the grievance** may not be designated to address the appeal." ECF No. 52-1 at 43 (emphasis in original).

Here, the Facility Grievance Coordinator assigned Grievance No. 997172 to S. Erickson, Unit Manager, and the initial response review was reviewed by E. Armel, the Superintendent of SCI-Fayette. *See* ECF Nos. 52-1 at 19, 20, and 21. Erickson was not named in the grievance, although Davis contends Erickson was "listed/named as the John Doe at the SCI-Fayette in the grievance," while Armel specifically was named. ECF No. 67 at 19. While some policy violations can be sufficient to excuse a procedural default,[13] the Court finds the alleged policy violation here is not enough to excuse the procedural default.

Davis's appeal undeniably exceeded the two-page limit contrary to DC-ADM 804; thus, the Court is constrained to find the improper filing establishes procedural default and a lack of proper exhaustion for purposes of 42 U.S.C. § 1997e(a). That said, even if Davis had properly exhausted, summary judgment is still warranted in favor of the DOC Defendants as each of his claims is without merit.

---

[13] Examples of such policy violations would include if the DOC failed to make grievance forms available, or interference by a DOC official, or DOC created an external impediment to the filing a grievance.

**B.     The Record Is Devoid of Evidence From Which A
Reasonable Fact Finder Could Conclude The DOC Had A
Policy, Practice, Procedure to Transfer "Juvenile Lifers"**

In general, all of Davis's claims stem from his contention that as a "juvenile

lifer," he should have been transferred to an institution in his home region after his

resentencing.  According to Davis, the DOC has a policy/practice/custom to transfer

"juvenile lifers" to an institution within their home region after resentencing.  Davis

contends "there is 513 juvenile lifers.  300 reside in Philadelphia.  In 2012 the DOC

began processing juvenile lifers and returning them to their home regions."  ECF

No. 66, at ¶ 25 (cleaned up).[14]  According to Davis, after his resentencing in 2018, he

"was the only juvenile lifer left who had not been made eligible for the programs

implemented for the juveniles[.]"  ECF No. 67 at 18.[15]  Rather, he was instructed to

file an "incentive-base transfer," which he contends is contrary to the policy that

had been approved and implemented for juvenile lifers.  *Id.*

Davis chiefly relies on three internal DOC memos to support his position that

a policy/program/procedure to transfer juvenile lifers existed:

> • A March 27, 2013 Memo from the Executive Deputy
> Secretary to all Superintendents, in which the
> Superintendents were informed that a number of "tasks"
> had been accomplished to expedite placement of juvenile
> lifers in their recommended programs.  ECF No. 67-9 at 1-
> 2;

---

[14]     According to a March 23, 2017 Memo regarding the Juvenile Lifers' Friends and Family Day,
at that time SCI-Fayette housed 30 juvenile lifers.  *See* ECF No. 67-10 at 6.

[15]     This claim is somewhat contradicted by Davis's February 2017 request to Superintendent
Lane wherein Davis states "[s]ince <u>Alabama v. Miller</u> went in effect the institution has provided the
juvenile lifers with every program the institution has to offer.  The institution has even made it
mandatory that I get a mental health evaluation monthly."  ECF No. 67-11 at 2.

● A June 16, 2016 Memo from the Executive Deputy
Secretary to all Superintendents regarding the Juvenile
Lifer Resentencing and Reentry Protocol.  ECF No. 67-21
at 2; and

● A June 21, 2016 Memo from Robert Hammond to
Superintendents regarding the implementation of juvenile
lifer video conferences.  ECF No. 67-10 at 2-3.

None of these memos, however, indicate a policy had been implemented to *transfer*

*all juvenile lifers* to their home regions after resentencing.  At best, each of these

memos demonstrates the DOC was instituting policies and programs to assist

juvenile lifers in their transition to reentry.[16]  For example, Attachment E to the

June 16, 2016 memo explains services being provided to the juvenile lifer

population, such as "identification & benefits enrollment, priority program

placement, treatment, educational and vocational programs, access to legal services,

mentoring (system spanner), transitional / reentry services."  ECF No. 67-21 at 3.

The "Transitional Housing Unit/Reentry Services" ("THU/RSOs") was explained to

have been "designed to focus exclusively on preparing an individual for **imminent**

**release** (within 6 to 12 months) to the community."  ECF No. 67-21 at 3 (**emphasis**

**added**).  *See also* ECF No. 67-7 ("The Interview: John Wetzel") ("One thing we did

after the 2012 U.S. Supreme Court [decision] was start making juvenile lifers

eligible for programs aimed toward release, such as vocational and job-readiness

---

[16]        As stated previously, it is undisputed that Davis had been sentenced to two life sentences
stemming from two separate convictions.  Although one life sentence was imposed for an offense
committed as a juvenile and was later reduced to 40 years imprisonment, upon parole of that
sentence, Davis immediately began serving  a separate life sentence that had not been reduced.
Therefore, as one serving a life sentence, his release was neither imminent nor was he in need of
transition to prepare him for reentry by comparison to other juvenile lifers who were and whom the
DOC memos understandably targeted.

training[.]").  However, Davis contends "on June 16, 2016, Mr. Wetzel issued a policy that returned juvenile lifers to their home regions to continue programs . . . [and] Defendant Hammond, during the juvenile lifers meeting, told the juvenile lifers about this policy."[17]  ECF No. 67 at 16.

The DOC Defendants emphatically deny the existence of a transfer policy for juvenile lifers.  *See* ECF No. 52-1 at 19; ECF No. 67-18 at 2 ("There is no policy in place that moves a juvenile lifter to his home region after being resentenced."); ECF No. 52-1 at 23 ("The Department does not have any such policy, practice or procedure in place to transfer juvenile lifers [to their home regions when they are resentenced].").  In response, Davis argues "the Defendant's custom of returning the 512 juvenile lifers to Albion, Camp Hill, Chester, Graterford, Laurel Highlands, Mahanoy, Pittsburgh, and Pine Grove to participate in the programs established for them constitute an official policy."  ECF No. 67 at 18.[18]

There is a dispute about what Defendant Hammond told the juvenile lifers during the video conferences.  Declarations submitted by Derrick Harvey and Davis state Defendant Hammond "guaranteed" or "assured" the juvenile lifers that H-Codes would be removed and the juvenile lifers would be returned to their home regions after resentencing.  *See* ECF No. 67-26 at ¶ 5; ECF No. 67-27 at ¶ 17.[19]  The

---

[17]     In 2016, Defendant Hammond conducted weekly video conference meetings with the juvenile lifers.  ECF No. 67-27, ¶ 15.

[18]     The DOC Defendants did not file a reply and, as a result, the Court does not have the benefit of having a response from Defendants to this particular argument.

[19]     These Declarations are the equivalent of an affidavit when considering the motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(4) and Commentary to 2010 Amendments.  The

DOC Defendants deny Hammond made any representations that juvenile lifers would be transferred upon resentencing.  ECF No. 53 at ¶ 24.

The Court concludes, even if Hammond made such these representations during these video conferences, the undisputed summary judgment evidence of record is clear that Hammond was not in a position to effectuate transfers as housing decisions, including transfers.  Hammond was the Treatment Program Manager with the DOC's Bureau of Treatment Services.  ECF No. 53 at ¶ 10.  Housing decisions are based upon various factors, "including custody level, mental health roster, education and programming needs, medical needs, separations, and available bed space."  ECF No. 52-1 at 23.

For all these reasons, the Court finds the summary judgment record has no evidence from which a reasonable fact finder could conclude a DOC policy/practice/procedure existed to *transfer* juvenile lifers to their home regions after resentencing.  But even if such a policy/practice/procedure did exist, the Court further finds the DOC Defendants would still be entitled to the entry of summary judgment as the summary judgment record has no evidence from which a reasonable fact finder would conclude that Davis's constitutional rights have been violated.

### C.    The Record Is Devoid of Evidence From Which A Reasonable Fact Finder Could Conclude the DOC Defendants Acted in Violation of the First Amendment

---

averments in both Declarations were made subject to the penalty of perjury, under 28 U.S.C. § 1746 and Fed .R. Civ. P. 56(c)(4).  The Court notes that while Davis's Declaration is dated, it is not signed.  *See* ECF No. 67-27 at 6.  Nonetheless, the DOC Defendants have not objected to the Court considering the Declaration and the Court exercises its discretion to not delay its ruling to grant Davis an opportunity to correct it because, corrected or not, it does not defeat summary judgment.  *Lauria v. Lieb,* No. 24-1461, --- F.4th ---, 2025 WL 2628170 (3d Cir. 2025).

Davis claims the DOC Defendants have refused to transfer him in retaliation for his engaging in protected activity. The DOC Defendants contend this claim has no merit because Davis cannot establish that any protected activity motivated the DOC Defendants to take adverse action. ECF No. 52 at 13.

To state a prima facie case of retaliation, a prisoner must demonstrate: (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) he suffered some adverse action at the hands of the prison officials;[20] and (3) a causal link between the [protected conduct] and the adverse action [in that the] conduct was a substantial or motivating factor in the decision to take that action." *Carter v. McGrady*, 292 F.3d 152, 157-59 (3d Cir. 2002) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)). "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000)).

As to the first element, the DOC Defendants acknowledge Davis's filing of grievances and lawsuits are protected conduct under the First Amendment, but argue it is unclear "what protected activity Davis contends was the impetus for the retaliatory action – grievance no. 717576, no. 732545, or the unrelated civil matter

---

[20] To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient 'to deter a person of ordinary firmness from exercising his [constitutional] rights.'" *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Bart v. Telford*, 67 F.2d 622, 625 (7th Cir. 1982)).

docketed at 18-cv-00804 in the Middle District of Pennsylvania." ECF No. 52 at

13.[21]  In response, Davis states he filed Grievance No. 664288 and a lawsuit against

Wetzel for denying him medical treatment for Hepatitis C.  ECF No. 67 at 18.

"Plaintiff, thereafter, was never made eligible for the programs Mr. Wetzel

implemented." *Id.*  Davis argues,

> Based upon the record a reasonable jury could conclude
> that Mr. Wetzel in retaliation for Plaintiff filing
> Grievance No. 664288 and Civil Action No. 2:17-cv-1293[22]
> against him, intentionally singled Plaintiff out for
> different treatment than the juvenile lifers similarly
> situation when there was [no] rational basis for the
> difference and it was not based on any legitimate
> penological interest.

ECF No. 67 at 19.  Davis also argues,

> Based upon the record a reasonable factfinder/ jury could
> conclude that Mr. Erickson, in retaliation for Plaintiff
> filing Civil Action No. 2:23-cv-00208 against him, intends
> to make sure that Plaintiff does not receive the programs
> that were implemented for the juvenile lifers where there
> is no legitimate penological interest for him doing so.

*Id.* at 20.

---

[21]    Davis also appears to claim that his parole was denied in retaliation for filing Grievance No.
997172.  *See* ECF No. 20, at ¶ 58.  He claims Erickson spoke with an unidentified parole staff
member, who allegedly stated Davis's parole request would be denied because he filed Grievance No.
997172 and a parole board member informed him any future parole requests would also be denied if
he filed additional grievances.  ECF No. 53 at ¶¶ 49, 54.  Davis filed a separate lawsuit regarding the
manner in which he was reviewed for, and denied, parole.  *See Davis v. Rosenberg, et al.*, Civil
Action No. 23-cv-0578 (W.D. Pa.).  Davis contended he was singled out for different treatment than
other similarly situated juvenile lifers when there was no rational basis for the difference in
treatment.  Similar to this lawsuit, he brought claims for First Amendment retaliation, violation of
the Equal Protection Clause of the Fourteenth Amendment, and the Eighth Amendment under 42
U.S.C. § 1983.  That lawsuit was dismissed in May 2024 when the District Court determined that
Davis's claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

[22]    Davis filed case no. 2:17-cv-1293 in this Court; the case was later transferred to the Middle
District of Pennsylvania and opened at case no. 18-cv-00804.

As to the second element, the DOC Defendants argue the denial of Davis's transfer request was not an adverse action, as the "premise is fundamentally flawed because the juvenile lifer transfer policy/practice upon which Davis relies, does not exist." ECF No. 52 at 13.

And as to the third element, the DOC Defendants argue, that even if such a policy/practice exists, Davis cannot show that any of his protected activity motivated the DOC Defendants to refuse his transfer request. ECF No. 52 at 13.

The Court concludes it is at the third element that Davis's claim fails. Retaliatory motive can be inferred from either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggests a causal link. *Id.* (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). *See also Williams v. PA Dep't of Corr.*, 2023 WL 2655406, at *14 (W.D. Pa. Feb. 2, 2023), *report and recommendation adopted sub nom., Williams v. PA Dep't of Corr.*, 2023 WL 2652298 (W.D. Pa. Mar. 27, 2023), *reconsideration denied sub nom. Williams v. PA Dep't of Corr.*, 2023 WL 5529992 (W.D. Pa. Aug. 28, 2023).

In essence, the summary judgment record lacks evidence to support a finding that a causal connection exists between the filing of Grievance No. 664228, Grievance No. 997172, Civil Action 18-cv-00804, or the filing of this lawsuit and any adverse action. *Burton v. Giroux*, 794 F. App'x 196, 198 (3d Cir. 2019) (quoting *Oliver v. Roquet*, 858 F.3d 180, 190 (3d Cir. 2017) (quotation marks omitted)). Rather, as discussed below, it is apparent the DOC Defendants' actions were taken

without regard to Davis engaging in protected activity. Davis repeatedly has been directed to follow the same policies/procedures to which all prisoners are subject, namely to request an incentive-based transfer and his H Code was not removed based on his past behavior. *See* ECF No. 52-1 at 17 and ECF No. 67-14 at 2 (addressing request to transfer) and ECF No. 52-1 at 15 and ECF No. 67-16 at 2 (addressing request to have H Code removed).

Davis's conjecture and speculation, without more, are not sufficient to meet his burden to establish the third prong of his retaliation claim. Thus, summary judgment will be entered in favor of the DOC Defendants on this claim.

### D.   The Record Is Devoid of Evidence From Which A Reasonable Fact Finder Could Conclude the DOC Defendants Acted in Violation of the Eighth Amendment

Davis's Eighth Amendment claim is tangentially related to his claim that he should be transferred from SCI-Fayette. He contends that by not being transferred to his home region, he has been exposed to toxic coal ash and that "with his chronic diabetic condition, [he] is at risk of having a heart attack or stroke from the toxic condition at the SCI-Fayette." ECF No. 67 at 21.[23]

The Eighth Amendment's prohibition of cruel and unusual punishment imposes constitutional limitations on a prisoner's conditions of confinement. *See Rhodes v. Chapman*, 452 U.S. 337 (1981); *Graham v. Connor*, 490 U.S. 386 (1989); *Wilson v. Seiter*, 501 U.S. 294 (1991). To state a viable conditions of confinement

---

[23]    He also seems to imply that his diabetes was caused by the exposure to coal ash. ECF No. 67-21.

claim, the plaintiff must: (1) allege a deprivation that is "objectively, sufficiently serious"; and (2) show that the prison official "ha[s] a sufficiently culpable state of mind." *Beers-Capitol v. Whetzel*, 256 F.3d 120,125 (3d Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (quotation marks and citations omitted). As courts have recognized, environmental or unsanitary prison conditions that pose a serious risk to the health of inmates may support a claim. *See Moore v. Rosa*, No. 21-cv-0933, 2021 WL 1143376, at *5 (E.D. Pa. Mar. 25, 2021) ("unsanitary conditions can support a cognizable § 1983 conditions of confinement claim."); *Quinn v. Tritt*, No. 3:18-cv-00632, 2021 WL 1621294, at *4 (M.D. Pa. Feb. 1, 2021), *report and recommendation adopted*, 2021 WL 1193868 (M.D. Pa. Mar. 30, 2021) (assessing inmate's claim of exposure to contaminated water as a conditions of confinement claim).

Similarly, the Eighth Amendment imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To state a viable failure to protect claim, an inmate must allege facts sufficient to support plausible inferences that: (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the prison official knew of and disregarded the excessive risk to inmate health and safety, and (3) the prison official's deliberate indifference caused the inmate to suffer harm. *Id.*; *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (*abrogated on other grounds as recognized by Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024)).

26

According to Davis, SCI-Fayette "is built on a Toxic coal ash dump. The coal ash got into the water system and polluted the institution." ECF No. 67 at 21 (internal citations omitted). *See also* ECF No. 67-3 at 17. He contends "[t]he drinking water at the prison is so polluted that prison staff sued for bottled water for themselves – and their dogs – and won." ECF No. 67 at 21.

In Grievance No. 997172, Davis raised concerns about being exposed to coal ash. In denying the grievance, Defendant Erickson stated, "There is no known toxic chemical coming from the ground of SCI-Fayette, and SCI-Fayette's medical is fully equipped to deal with any diabetic situation." ECF No. 52-1 at 19; ECF No. 67-18 at 2.

The DOC Defendants argue that Davis's Eighth Amendment claim fails because the only injury he has alleged is his assertion that his health is *at risk* due to exposure to toxic coal ash. ECF No. 2 at 16. The Court finds the summary judgment record has no evidence from which a reasonable fact finder could find that Davis's diabetes was caused by exposure to coal ash or that he "is at risk of having a heart attack or stroke from the toxic condition at the SCI-Fayette." ECF No. 67 at 21. Rather, the Court finds Davis's assertion that he is *at risk* is speculatory and unsupported by any evidence of record. *See Celotex Corp.,* 477 U.S. at 325 (the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion). Such unsubstantiated speculation is not sufficient to withstand summary judgment.

*Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (*abrogated on other grounds by Rotkiske v. Klemm,* 890 F.3d 422 (3d Cir. 2018) (en banc)).

For these reasons, summary judgment will be granted in favor of the DOC Defendants on Davis's Eighth Amendment claim.

### E. The Record Is Devoid of Evidence From Which A Reasonable Fact Finder Could Conclude the DOC Defendants Acted in Violation of the Fourteenth Amendment

Davis's last claim is that the DOC Defendants' refusal to transfer him violates his rights under the Equal Protection Clause of the Fourteenth Amendment.  The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV § 1.  "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.'"  *Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

Davis alleges he was treated differently than other similarly situated juvenile lifers because (1) he was not transferred to his home region after resentencing and (2) his security coding/ housing designation ("H code") was not removed and there was no rational basis for the difference in treatment.  The Court finds this claim to lack support as Davis has failed to provide any factual support that he was treated differently from other juvenile lifers who were similarly situated.

The uncontroverted summary judgment record evidence shows that when Davis inquired about a transfer, he was directed to follow the same

policies/procedures to which all prisoners are subject.  *See* ECF No. 52-1 at 15 ("You are also encouraged to speak to your counselor and unit management team regarding the criteria for an Incentive Based Transfer.  All requests for transfer start at the institutional level and must first be approved by your current institution."); ECF No. 52-1 at 17; ECF SCI 67-14 at 2 ("if you feel that you meet the criteria established in **11.1.1 Section 2 – Transfer Petition System**, you should communicate this to you Unit Management team to make this request.") (emphasis in original).

Similarly, in 2022, when Davis inquired why his H Code had not been removed, ECF No. 52-1 at 13, he was informed,

> You have been assigned the "H" code based on your past behavioral history.  The program code is reviewed every year during your annual review.  The starting point regarding your "H" Code begins with your unit team at the institutional level.  You are encouraged to speak to your unit team about your goals, and what may be expected of you for staff to support removing the code.

ECF No. 52-1 at 15; ECF No. 67-16 at 2.  *See also* ECF 52-1 at 18; ECF No. 67-2 at 2 ("By policy, if an institution determines an inmate should be maintained on their Escape Risk List, the inmate must be assigned a Custody Level 4H . . . Assignment of H Code and Custody Level 4 will be evaluated at your next Annual review for removal or continued inclusion on the Escape Risk list.); ECF No. 67-13 at 2 ("[y]ou were assigned the appropriate security coding/designation in accordance with policy and procedure.  The designation you are referring to is not a punitive designation, rather it is an identifier to recognize those individuals who have demonstrated the

29

need to be monitored more closely due in previous behaviors that meet a certain criteria.").

As noted previously, it also appears Davis may not have been similarly situated to other juvenile lifers. Although he was resentenced in 2018, he remained subject to a detainer for a consecutive mandatory life sentence for another homicide charge. He began serving this second life sentence in 2023 following the grant of parole from his "juvenile life" sentence. *See* ECF No. 53 at ¶ 15; ECF No. 66 at ¶ 15.

For these reasons, summary judgment will be granted in favor of the DOC Defendants on Davis's equal protection claim.

### F.    The Unserved and Unnamed John Doe Defendants Will Be Dismissed

Davis named two "John Doe" defendants in the Amended Complaint. The first John Doe is identified as working for the Department of Corrections. ECF No. 20 at ¶ 9. The second John Doe is identified as working at SCI-Fayette. *Id.* ¶ 10. Discovery has closed and Davis has had ample time and opportunity to identify and serve the John Doe Defendants. Yet he has failed to do so.

Because this Opinion applies in equal force to the two unidentified John Doe Defendants, the John Doe Defendants will be dismissed under 28 U.S.C. § 1915A(b)(1).

### V.    Conclusion

For all these reasons, the Court finds there is no genuine dispute as to any material fact and the DOC Defendants are entitled to judgment as a matter of law.

The DOC Defendants' Motion will be granted in its entirety and the Clerk of Court will be directed to close this case. An appropriate Order follows.

Final Judgment pursuant to Federal Rule of Civil Procedure 58 will be entered by separate Order.

DATED this 25th day of September, 2025.

BY THE COURT:


s/Christopher B. Brown
Christopher B. Brown
United States Magistrate Judge

cc:    KEVIN DAVIS
       QQ-0944
       SCI FAYETTE
       50 Overlook Drive
       LaBelle, PA 15450
       (via U.S. First Class Mail)

       Kelly J. Stewart
       Office of General Counsel
       Department of Corrections
       (via ECF electronic notification)